# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DEBORAH EVERETT,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:11-cv-219
Beckwith, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 16) and the Commissioner's response in opposition (Doc. 19).

## I.   Procedural Background

Plaintiff protectively filed applications for DIB and SSI in August 2007, alleging disability since December 30, 2002[1], due to degenerative disc disease, high blood pressure, a right leg drag, and problems with her right breast. Plaintiff's applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a de novo hearing before administrative law judge (ALJ) Donald A. Becher. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On January 26, 2010, the ALJ issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request for review by the

---

[1]At the administrative hearing, plaintiff amended her alleged disability onset date to October 1, 2006, to coincide with the date she last worked. *See* Tr. 33, 156.

Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II.   Medical Evidence[2]

Plaintiff was seen at University Hospital on April 28, 2003, with complaints of pain in her low back which radiated down her buttocks and into her right leg, accompanied by numbness and tingling in her right leg; pain and cramping in her wrist, hand, and fingers; migraine headaches; and anxiety.   (Tr. 302).   In June 2003, plaintiff was treated at University Hospital's acute unit for back pain.   (Tr. 305).   Plaintiff complained of worsening pain in the lumbar area, burning and shooting pain down her right leg, and occasional weakness, tingling, and numbness. Plaintiff was diagnosed with back pain and hypertension.   (*Id*.).   A lumbar spine MRI performed on July 12, 2003, revealed minimal degenerative disc disease and facet arthropathy at L4-5 with subarticular stenosis of left L4-5.   (Tr. 294-95).

Plaintiff underwent a stress test due to chest pain and shortness of breath on August 28, 2003.   (Tr. 296-98).   Plaintiff was unable to be optimally studied on the treadmill due to debility and she therefore performed low-level exercise by swinging her legs.   The ECG impression was nondiagnostic due to inadequate heart rate.   The test result was normal myocardial perfusion global left ventricular function, which could be consistent with a nontransmural infarct.   (Tr. 298).

In July 2004, plaintiff was seen at the Hoxworth Adult Medicine Clinic (Hoxworth) at University Hospital with complaints that her right leg was weak and had been dragging for over

---

[2]Plaintiff alleges no errors arising from the ALJ's evaluation of the medical evidence pertaining to any mental impairments.   Accordingly, the Court has summarized herein the medical evidence relating only to plaintiff's physical impairments.

a year. She had low back pain and she was experiencing right-sided chest pain radiating down her right arm. (Tr. 316). Plaintiff's complaints of back pain and right leg weakness had been stable for one to two years or more. Plaintiff was referred to the Physical Medicine and Rehabilitation Clinic (PM&R). (*Id.*).

Plaintiff was seen at the PM&R Clinic on August 30, 2004, with complaints of chronic intermittent back pain that radiated down her right leg of two years' duration. (Tr. 307). Plaintiff was also experiencing balance problems, possibly related to her hypertension. The physician rated plaintiff's strength as 4/5 in her right lower extremity and found she had tenderness in her lumbosacral area, sacroiliac joint tightness, and decreased range of motion in her back. It was recommended that plaintiff continue physical therapy, and she was prescribed Elavil and NSAIDs.

Plaintiff attended 12 sessions of physical therapy at Spectrum Rehabilitation for right shoulder pain from July through September 2004. (Tr. 277-79). She was discharged after meeting some of her goals when she declined to continue treatment. (Tr. 277). Upon discharge, her strength was rated 4/5, her pain was rated as 0-2/10, and the therapist noted that plaintiff was able to return to activities of daily living. (*Id.*).

On September 13, 2004, plaintiff presented at the emergency room at Christ Hospital with recurring chest pain. (Tr. 236-39). Plaintiff complained of some right-sided weakness, which she explained was always present because of a chronic back injury. A chest x-ray showed no acute disease and mild cardiomegaly. (Tr. 237). Plaintiff was discharged for follow-up with her family physician after testing revealed no indication of acute coronary syndrome. (*Id.*). Plaintiff presented three days later at Hoxworth for follow-up of chest discomfort. (Tr. 322). Other complaints noted were decreased activity and chronic back pain.

3

Her medication was increased or continued and blood work was ordered.   (*Id.*).   When seen at Hoxworth for a follow-up on September 20, 2004, plaintiff reported that she still had back pain with radiculopathic pain radiating down her right leg with weakness, and right shoulder pain that radiated down her right arm of one month's duration.   (Tr. 320).   It was recommended that she continue physical therapy, and she was given NSAIDs and an orthopedic referral for her shoulder and arm.   (*Id.*).

When plaintiff returned to the PM&R Clinic in October 2004, it was noted that she had started physical therapy one month earlier because she was feeling worse.   (Tr. 310).   Plaintiff complained of tingling and numbness and difficulty lifting heavy objects, sharp pain radiating down her right leg to the ankle, and right-sided weakness of three to four months' duration. (*Id.*).   Plaintiff was found to have tenderness in her lumbar paraspinal region and in the right SI joint, tightness of the lumbar paraspinal muscles, and diffuse right-sided weakness rated as 4/5, but she retained normal strength in her left upper and lower extremities.   (*Id.*).   Light and pinprick sensation was intact.   It was recommended that plaintiff obtain an MRI of the lumbar spine and that she continue physical therapy.   Her medication was increased.   (*Id.*).

In November 2005, when seen at Hoxworth for a follow-up examination, plaintiff complained of knee pain and pain in her left foot and heel when walking.   (Tr. 327).   The physician recommended that plaintiff lose weight and exercise for her knee issues, prescribed Tylenol and a cream, and referred plaintiff to podiatry.

Plaintiff saw a podiatrist at University Hospital on January 30, 2006, and was diagnosed with a pes planus deformity with splay foot on the left, IPK (intractable plantar keratosis[3]) on

---

[3]Intractable plantar keratosis (IPK) is a discrete, focused callus, usually about 1 cm, on the plantar aspect of the forefoot.   Typically, IPKs occur beneath one or more lateral metatarsal heads or under another area of pressure.

several toes, and plantar calcaneus issues on the left foot as shown by x-rays.   (Tr. 329).   The

podiatrist debrided the IPK lesions on plaintiff's left foot and administered a steroid injection.

(*Id.*).

MRIs of plaintiff's lumbar and thoracic spine were taken on July 29, 2006.   (Tr.

332-36).   The MRI of the lumbar spine revealed: "Progressive degenerative disc disease and

facet arthropathy at L4-5 with increased anterolisthesis causing increased subarticular narrowing.

Minimal mass-effect on the bilateral L5 nerve roots could be considered."   (Tr. 333).   The

MRI of the thoracic spine showed mild to moderate multilevel disc desiccation and disc height

loss, mild to moderate multilevel osteophyte formation, and mild to moderate spondylosis with

mild multilevel central stenosis without evidence of significant cord compression.   It also

revealed cord signal changes which were difficult to characterize due to poor image quality, but

which were somewhat suspicious for intramedullary signal abnormality involving the T10 level,

with a differential diagnosis including demyelination.   (Tr. 332-36).   It was noted that further

studies would be helpful.

Plaintiff experienced gynecologic problems in 2006 (Tr. 343-48, 357-60) and underwent

a total hysterectomy and breast surgery December 20, 2006.   (Tr. 361-69).

Plaintiff was evaluated for physical therapy in August 2007 for diffuse right-sided pain

that limited her tolerance for activity.   (Tr. 273-75).   Straight leg raising was negative.   The

physical therapist questioned plaintiff's effort on strength testing of the right side.   (Tr. 274).

Plaintiff's rehabilitation potential was rated as fair to good.   However, plaintiff did not attend

---

*See* http.//emedicine.medscape.com.

physical therapy after the first session and was discharged for declining to continue treatment or for noncompliance on November 20, 2007.   (Tr. 270).

Plaintiff was seen at the clinic at University Hospital in December 2007, complaining of pain in her shoulders after she reported falling at home due to a gait disturbance.   (Tr. 383). She was diagnosed with an antalgic gait.   It was noted that plaintiff was obese and it was recommended that she increase her exercise and weight loss.   It was also noted that her pain was relieved with NSAIDs.   Plaintiff was referred to physical therapy.

Plaintiff attended physical therapy from January through March 2008 to improve her gait, reduce the frequency of her falls, and manage her right drop foot.   (Tr. 260-69).   Upon initial evaluation, plaintiff reported that she had a history of stumbling and periodically used an umbrella for ambulation.   (Tr. 267).   Plaintiff complained of tingling in her fingertips and pain and weakness in her right leg and arm.   (Tr. 267-68).   Plaintiff reported that her pain was steady but increased with lifting.   (*Id.*).   The physical therapist reported that plaintiff had a right foot drop, decreased hamstring flexibility, weakness in the right hip and knee, numbness and tingling in her right lower extremity, and right upper extremity weakness.   (Tr. 266). Plaintiff's goal with treatment was to walk without an assistive device and without a limp.   (Tr. 261).

Consultative physician Dr. Jennifer Wischer Bailey, M.D., examined plaintiff at the request of the state agency and prepared a report dated January 3, 2008.   (Tr. 243-50). Plaintiff reported to Dr. Bailey that she is unable to work due to chronic back pain.   Range of motion of the cervical spine was within normal limits.   Muscle and grasp strength were well-preserved over the upper extremities as were pinprick and light touch.   Manipulative ability was normal bilaterally.   The bicep and tricep reflexes were brisk bilaterally.   Dr. Bailey

6

reported in summary that plaintiff is a morbidly obese individual who ambulated with a slight limp. Plaintiff was able to forward bend without difficulty. Straight leg raise was negative bilaterally. Plaintiff had evidence of a mild right foot drop with slight weakness involving the right foot as well as numbness over the dorsum of the right foot. There was no evidence of muscle atrophy. Dr. Bailey reported that "[t]he rest of her examination was entirely normal." (Tr. 245). Dr. Bailey opined that obesity contributes to plaintiff's symptoms, and weight reduction would diminish her complaints. (*Id.*). Dr. Bailey diagnosed plaintiff with morbid obesity, chronic back pain due to right-sided radiculopathy, and mild right foot drop. (*Id.*). Dr. Bailey opined that plaintiff appeared capable of performing a mild to moderate amount of sitting, ambulating, standing, bending, kneeling, pulling, lifting, and carrying heavy objects. (*Id.*).

State agency physician Dr. Leslie Green, M.D., reviewed the file in February 2008 and completed a physical residual functional capacity (RFC) assessment. (Tr. 251-59). Dr. Green opined that plaintiff could lift/carry up to 20 pounds occasionally and 10 pounds frequently; stand/walk at least two hours but no more than four hours in an eight-hour workday; and sit for about six hours in an eight-hour workday. Her ability to push/pull was limited in the lower extremities. (Tr. 252-53). Plaintiff could occasionally climb ramps and stairs but could never climb ladders, ropes and scaffolds. She could occasionally balance, stoop, kneel, crouch and crawl. (Tr. 253). Plaintiff could not work around unprotected heights or hazardous machinery due to right foot weakness. (Tr. 255). Dr. Green deemed plaintiff's allegations to be "partially credible." (Tr. 256). State agency physician Dr. Edmond Gardner, M.D., affirmed Dr. Green's assessment as written in June 2008, noting plaintiff "has had recent foot surgery and was to be considered to be full [weight] bearing [bilaterally] in support shoe with a cane. She has been noncompliant with 'Rx.' She should not require a cane after the post op period and should

7

be able to function at the previous RFC after recovery which will not last 12 months." (Tr. 550).

When seen at Hoxworth in February 2008, plaintiff's complaints included intermittent radicular pain in her neck and down her right shoulder and arm but without a decrease in strength, low back pain, a fall three weeks prior, and poor balance. (Tr. 387). Plaintiff was prescribed a cane and was to continue with physical therapy. The clinic physician completed an Access bus form for plaintiff. (Id.).

Debra Johnson[4] completed a functional limitations questionnaire for the Bureau of Vocational Rehabilitation on April 2, 2008. (Tr. 725). She wrote that plaintiff "states" she is unable to stand. She opined that plaintiff can sit 3½ to 5 hours in an 8-hour work day, but she must be able to get up and change positions; she can occasionally lift up to 10 pounds; she cannot use her feet for repetitive movements such as operating foot controls; she cannot use her hands for repetitive "simple grasping" due to "[right] side problems" or for repetitive "fine manipulation," but she can use her hands for repetitive pushing and pulling "depend[ing] on [the] job"; she cannot bend, squat, crawl, or climb; and she can push/pull and reach above shoulder level. (Tr. 725).

A March 25, 2008 EMG of plaintiff's right upper extremity and right lower extremity was "essentially normal." (Tr. 388-89).

Plaintiff began treating with podiatrist Dr. Robert Brarens, DPM, in April 2008 for

---

[4]Both the ALJ and plaintiff refer to Debra Johnson as "Debra Johnson, M.D." (Tr. 16; Doc. 16 at 10) and plaintiff states that "Dr. Debra Johnson" was one of her treating physicians at University Hospital. (Doc. 16 at 10). However, it appears that Debra Johnson is not a physician but is a Certified Nurse Practitioner (CNP). A March 2008 University Hospital record identifies her as "Debra Johnson, CNP" (Tr. 388) and she signed the functional evaluation simply "Debra Johnson" (Tr. 725). Moreover, there is not a Debra Johnson, M.D. or D.O. licensed in the State of Ohio. See https://license.ohio.gov.

complaints of ankle pain that began one month prior and increased with excessive walking or standing, painful toenails, and calluses. (Tr. 405). Her medications included aspirin and ibuprofen. Dr. Brarens diagnosed plaintiff with bilateral porokeratomas, bilateral peripheral vascular disease, an ingrown toe nail on the left, bilateral metatarsalgia, a left bone spur, arthritis in the feet and ankles, and limb pain. In June 2008, plaintiff presented at University Hospital for pre-operative clearance prior to surgery on her left foot. (Tr. 554). Her clinical history listed shortness of breath with exertion, a near inability to climb stairs, and episodes of diaphoresis. (*Id.*). A stress test performed on June 11, 2008, was negative for ischemia, and plaintiff's resting ECG showed bradycardia and non-specific T-wave abnormalities. (Tr. 567-70).

In July 2008, Dr. Brarens performed arthroplasty on plaintiff's left foot. (Tr. 695). Following surgery, Dr. Brarens recommended that plaintiff wear various types of specialized boots or shoes, including an Unna boot, a cam boot, and an ankle-foot orthotic (AFO). (Tr. 665, 669, 673, 674, 676, 687, 694). Plaintiff continued to treat with Dr. Brarens through October 2009 for her foot conditions (Tr. 663-88), although Dr. Brarens reported in October 2009 that she had been noncompliant with follow-up appointments. (Tr. 663).

Plaintiff attended physical therapy from October until December 2008 (Tr. 611-661) and again from February until April 2009. (Tr. 574-610). Plaintiff underwent therapy for dominant-sided hemiplegia (right-sided weakness), low back pain, and left foot and ankle issues. Plaintiff was discharged from physical therapy for her left foot on December 2, 2008, due to completing the current program, reaching the maximum number of visits allowed under her insurance, and plateauing on her progress. (Tr. 619). It was noted that she had a mild antalgic gait when walking with a cane and she was waiting for an AFO brace for her left foot. (*Id.*).

9

The therapist stated that plaintiff had made excellent progress and opined that her prognosis was good.  (*Id.*).   Plaintiff was discharged from physical therapy for her right spine and degenerative disc disease on December 18, 2008, after additional physical therapy visits were not approved by her insurance company.  (Tr. 611).   The physical therapist reported that plaintiff should respond well to conservative physical therapy.  (*Id.*).   Plaintiff was discharged from physical therapy in April 2009 for unspecified right-sided hemiplegia after 12 visits.  (Tr. 574).   Her prognosis at the time of discharge was good.  (*Id.*).

On February 4, 2009, plaintiff underwent an MRI of her entire spine due to the clinical indication of right-sided weakness.  (Tr. 564-66).   The impression of the cervical spine was: "Limited study demonstrating no evidence of cord compression.   Significant bilateral foraminal stenosis at C6."  (Tr. 564).   The thoracic spine impression was multilevel degenerative disc disease with no evidence of high grade cord compression.  (Tr. 566).   There was probable multilevel neural foraminal stenosis.   The findings were poorly documented due to the low resolution of the MRI.   The limited MRI of the lumbar spine demonstrated no significant changes since 2004.  (*Id.*).   The subtle anterolistheses at L4-L5 previously questioned in 2006 could not be confirmed.

On September 25, 2009, Dr. Brarens wrote a recommendation on a prescription pad that plaintiff should not live in a building with stairs due to arthritis of the foot and ankle and chronic tendonitis, which could be exacerbated by stairs.  (Tr. 724).

Plaintiff transferred her primary care from University Hospital to the Braxton Cann Clinic in September 2009.  (Tr. 701-11).

10

## III.  Analysis

### A.  Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.   42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI).   The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.   42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.   If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).   The claimant has the burden of proof at the first four steps of the sequential evaluation process.   *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004).   Once the claimant establishes a prima facie case by showing an inability to

11

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B.    The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The claimant met the insured status requirements for disability insurance
> benefits on her amended onset date of October 1, 2006, and continued to meet
> them through September 30, 2008.
>
> 2. There is no evidence that the claimant has engaged in any substantial gainful
> activity since her amended onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et
> seq.*).
>
> 3. The claimant has the following severe impairments: degenerative disc disease,
> bilateral porokeratomas, peripheral vascular disease, bilateral hammertoes,
> arthritis of the foot and ankle with joint instability and foot drop, bilateral
> metatarsalgia, and obesity (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments
> that meets or medically equals one of the listed impairments in 20 C.F.R. Part
> 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526,
> 416.920(d), 416.925 and 416.926).
>
> 5. Careful consideration of the entire record shows that the claimant has the
> residual functional capacity to perform a range of sedentary work, as defined in
> 20 CFR 404.1567(a) and 416.967(a), with the additional limitations set forth
> below.
>
> . . . .
>
> [T]he claimant could perform a range of sedentary work.    She could lift up to 10
> pounds.    Standing and/or walking would be limited to two hours total.    She
> could stand 15 to 20 minutes at any one time.    She could walk three blocks at
> any one time.    She could sit up to 1 hour at any one time, with no limit on the
> total time sitting each workday.    She could occasionally bend and climb stairs.

She cannot crouch or kneel.    She could frequently reach, handle, and finger with the right arm.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[5]

7. The claimant was born [in] . . . 1961, was 45 years old on her amended onset date, and [is] considered to be a younger individual (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[6]

11. The claimant has not been under a disability, as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12-18).

## C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley*

---

[5]Plaintiff's past relevant work was as an apartment manager, receptionist and machine feeder.  (Tr. 17, 157-64, 166-74).

[6]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform 2,900 unskilled sedentary jobs in the regional economy, citing as examples of such jobs hand packer, sedentary inspector and bench assembler.  (Tr. 17, 65-67).

13

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

### D. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred by failing to fully account for plaintiff's weakness and loss of coordination in her right upper extremity in the RFC, and (2) the ALJ erred by improperly disregarding the opinion of treating physician Dr. Robert Brarens. Plaintiff further seeks a remand for consideration of new and material evidence pursuant to Sentence Six of 42 U.S.C. § 405(g).

**1.  This matter should be remanded for consideration of new and material evidence.**

Plaintiff seeks a remand under Sentence Six of 42 U.S.C. § 405(g) for administrative consideration of evidence that is not part of the administrative record but which is attached to the Statement of Errors.[7]   The evidence includes: (1) an MRI of the thoracic spine performed in November 2010 that shows "[s]uspect patchy nonenhancing abnormal cord signal without change in cord size" which is "most compatible with demyelination" (Doc. 16-1); (2) an MRI of the cervical spine performed in November 2010 that shows "patchy abnormal cord signal without enhancement involving most levels of the cervical cord with probable brainstem involvement" which is "most compatible with demyelination" (*Id.*); (3) MRIs of plaintiff's brain and thoracic spine performed on December 30, 2010, that revealed, among other findings, a decreasing T2 hyperintense signal involving the anterior, medial left cerebellar hemisphere which may reflect an evolving subacute infarct; an enhancing mass lesion identified with signal characteristics most compatible with a meningioma; and a slight decrease in the right frontal and parietal white matter foci of hyperintense T2 signal which may reflect the sequel of migraine or improving ischemic or inflammatory changes (Doc. 16-2); (4) a letter dated February 4, 2011, from Dr. Ryan Runyon, M.D., stating that plaintiff was diagnosed with multiple sclerosis (MS) by Dr. Robert Reed in January 2011, and would continue to be treated for it at the University of Cincinnati medical facilities (Doc. 16-3); and (5) the results of blood tests from January 25,

---

[7]The District Court's review is limited to evidence that was before the Commissioner during the administrative proceedings.  *Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 685 (6th Cir. 1992). When the Appeals Council declines review, as it did in this case, it is the decision of the ALJ and therefore the facts before the ALJ that are subject to appellate review.  *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993).   The Court may not consider evidence presented for the first time to either the Appeals Council or the District Court in deciding whether to uphold, modify, or reverse the ALJ's decision.  *Id.* at 696.  *See also Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996).

2011.[8]   (Doc. 16-4).   Plaintiff argues that the new evidence is material because (1) the MS

diagnosis provides a reasonable justification for her right-sided weakness, pain and fatigue, which

plaintiff states the ALJ believed was disproportionate to the extent of the degenerative spinal

changes on the imaging available to him (Doc. 16 at 15), and (2) the MRIs provide "a valid and

credible" explanation for plaintiff's long-standing complaints of diffuse right-sided weakness and

poor coordination that the ALJ believed she was exaggerating.   (*Id.* at 19).   Plaintiff argues the

record contains evidence of clinical signs of multiple sclerosis going back to at least 2006 and

arguably even 2003.   (*Id.* at 18, citing Tr. 243-45, 260-79, 302, 305, 307, 310, 316, 320, 373, 383,

387, 573-576).   Plaintiff further contends that partly as a result of the new MRIs, she was

diagnosed with multiple sclerosis and granted benefits on a subsequent SSI claim.   (*Id.*, citing

Doc. 16-5).   The Court finds plaintiff's request well-taken and that a remand under Sentence Six

is appropriate in this case.

   "The district court can . . . remand the case for further administrative proceedings in light of

the evidence, if a claimant shows that the evidence is new and material, and that there was good

cause for not presenting it in the prior proceeding."   *Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146,

148 (6th Cir. 1996).   Evidence is "new" if it was not in existence or available to the claimant at the

time of the administrative proceeding.   *Foster v. Halter,* 279 F.3d 348, 357 (6th Cir. 2001).

Evidence is considered "material" if "there is a reasonable probability that the [Commissioner]

would have reached a different disposition of the disability claim if presented with the new

evidence."   *Foster,* 279 F.3d at 357 (citations and internal quotation marks omitted).   To show

"good cause" the moving party must present a valid justification for the failure to have acquired

---

[8] Plaintiff's blood tests include findings of elevated IgG index levels which indicate increased production of IgG within the central nervous system, found in about 90% of MS cases.   *See* http://labtestsonline.org/understanding/conditions/multiplesclerosis/start/2.

and presented the evidence in the prior administrative proceeding. *Id.* *See also Oliver v. Sec'y of H.H.S.,* 804 F.2d 964, 966 (6th Cir. 1986); *Willis v. Sec. of H.H.S.,* 727 F.2d 551, 554 (6th Cir. 1984).

Here, the MRI results, Dr. Reed's January 2011 diagnosis of multiple sclerosis, and the January 2011 blood test results are new as they were not in existence at the time of the administrative proceeding. *Foster,* 279 F.3d at 357. The evidence is also material because it provides, in retrospect, evidence of an underlying medical determinable physical impairment that could reasonably be expected to produce plaintiff's alleged pain, weakness, instability, and other symptoms--allegations that the ALJ determined were not fully credible and which directly bear on plaintiff's ability to function in a work environment. This is especially true given the nature of MS and the progression and remission of the disease over time.

Multiple sclerosis is a slowly progressive central nervous system disease characterized by disseminated patches of demyelination[9] in the brain and spinal cord, resulting in multiple and varied neurologic symptoms and signs, usually with remissions and exacerbations.[10] *See*

---

[9]Demyelination is defined as the destruction, removal, or loss of the myelin sheath of a nerve or nerves. Dorland's Medical Dictionary, 27th ed. (1988) at 443.

[10]Multiple sclerosis is characterized by various symptoms and signs of central nervous system dysfunction, with remissions and recurring exacerbations. The most common presenting symptoms are the following:

- Paresthesias in one or more extremities, in the trunk, or on one side of the face
- Weakness or clumsiness of a leg or hand
- Visual disturbances (*e.g.,* partial loss of vision and pain in one eye due to retrobulbar optic neuritis, diplopia [double vision] due to ocular palsy, scotomas)

Other common early symptoms include slight stiffness or unusual fatigability of a limb, minor gait disturbances, difficulty with bladder control, vertigo, and mild affective disturbances; all usually indicate scattered CNS involvement and may be subtle. Excess heat (*e.g.,* warm weather, a hot bath, fever) may temporarily exacerbate symptoms and signs.

http://www.merckmanuals.com/professional/neurologic_disorders/demyelinating_disorders/mult iple_sclerosis_ms.html?qt=MS&alt=sh. "Multiple sclerosis is an incurable, progressive disease subject to periods of remission and exacerbation." *Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990). Because of the episodic nature of the disease, an ALJ must consider the frequency and duration of exacerbations, the length of the remissions, and the evidence of any permanent disabilities in evaluating multiple sclerosis. *Id.*

Here, the MRI and blood test results provide objective support for Dr. Reed's diagnosis of MS, and plaintiff's symptoms of pain, fatigue, weakness, gait disturbance, tingling, numbness, and instability are well-documented throughout the University Hospital and the other medical records for the pertinent time period and are fully consistent with a demyelinating disorder like MS. (Tr. 236-39, 245, 266-68, 305, 310, 316, 320, 383, 387). *See Young v. Apfel,* 221 F.3d 1065, 1067 n. 3 (8th Cir. 2000) (noting symptoms of multiple sclerosis "include muscle weakness, numbness, fatigue, loss of balance, pain, and loss of bowel and bladder control"); *accord Clark v. Barnhart*, 64 F. App'x 688, 691 (10th Cir. 2003)[11]. In addition, the new evidence sheds further light on the 2006 MRI findings, which established a differential diagnosis of demyelination disease, suggesting the possible presence of MS at that time. This evidence is material because it speaks directly to whether plaintiff had a disabling impairment prior to her date last insured in 2008 for

---

Mild cognitive impairment is common. Apathy, poor judgment, or inattention may occur. Affective disturbances, including emotional lability, euphoria, or, most commonly, depression, are common. Depression may be reactive or partly due to cerebral lesions of MS. A few patients have seizures.

http://www.merckmanuals.com/professional/neurologic_disorders/demyelinating_disorders/multiple_sclerosis_ms.h tml?qt=MS&alt=sh.

[11]Symptoms of multiple sclerosis include: fatigue, numbness, gait, balance and coordination problems, bladder and bowel dysfunction, vision problems, dizziness and vertigo, pain, cognitive function, emotional changes, depression, spasticity, speech disorders, swallowing problems, headache, hearing loss, seizures, tremor, and respiratory problems. *See* http://www.nationalmssociety.org/about-multiple-sclerosis/symptoms/index.aspx.

DIB, as well as to the issue of plaintiff's onset date for SSI benefits. At the very least, if plaintiff was granted SSI in December 2010 based on MS, it is reasonable to consider whether plaintiff's onset predated the December 2010 application date, recognizing that plaintiff's MS did not have its sudden onset on the date of her application. As multiple sclerosis is a disease that requires a longitudinal evaluation, the new evidence presented by plaintiff may explain her varied symptoms over the years, which the ALJ could reasonably determine further limits her already limited sedentary RFC. While this evidence post-dates plaintiff's insured status, it is nevertheless relevant to whether plaintiff in fact suffered from a yet to be diagnosed disease prior to the expiration of her insured status. *See Begley v. Mathews*, 544 F.2d 1345, 1354 (6th Cir. 1976) ("Medical evidence of a subsequent condition of health, reasonably proximate to a preceding time, may be used to establish the existence of the same condition at the preceding time"). *See also Anderson v. Comm'r of Social Security,* 440 F. Supp.2d 696, 699 (E.D. Mich. 2006) ("[M]edical evidence that postdates the insured status may be, and ought to be, considered insofar as it bears on the claimant's condition prior to the expiration of insured status."). The MRI results, blood tests, and Dr. Reed's diagnosis, in conjunction with the other evidence of record, demonstrate there is a reasonable probability that a different disposition would result from consideration of the new evidence presented by plaintiff. *Foster,* 279 F.3d at 357.

Also, good cause for remand exists in this matter. The 2010 MRI results, Dr. Reed's diagnosis, and the January 2011 blood tests were not available at the ALJ hearing. *See Fazio v. Heckler,* 750 F.2d 541, 542-543 (6th Cir. 1984) ("Good cause" exists because this evidence was simply not available at the ALJ hearing."); *Wilson v. Sec'y of H.H.S.,* 733 F.2d 1181, 1182-83 (6th Cir. 1984) (same). Plaintiff has presented a valid justification for not acquiring and presenting this evidence in the prior administrative proceeding.

Accordingly, a remand pursuant to Sentence Six of 42 U.S.C. § 405(g) for further administrative proceedings in light of the evidence presented to this Court is warranted. Plaintiff's request for a Sentence Six remand should be granted.

**2. The ALJ did not err by failing to fully account for plaintiff's weakness and loss of coordination in her right upper extremity in the RFC.[12]**

Plaintiff argues that the ALJ erred by fashioning an RFC that limited her to frequent reaching, handling and fingering with her dominant right arm because the evidence of record supports the imposition of stricter limitations in this regard. Plaintiff acknowledges that she had a negative EMG of her right upper extremity on March 25, 2008 (Tr. 388-89), but she alleges the ALJ failed to take into account the following positive findings, some of which were made following the EMG:

- evidence of weakness and/or clumsiness involving plaintiff's right hand (Doc. 16 at 20-21, citing Tr. 538, 574-610)
- MRIs from July 2006 and February 2009 that show significant disc herniations and degenerative hypertrophy causing stenosis of the spine at all levels which, contrary to the ALJ's finding, "do cause impingement on nerves" (*Id.* at 21, citing Tr. 332-37, 471-75, 564-66)
- a diagnosis of radiculopathy from her cervical spine down her right arm (*Id.*, citing Tr. 564-66); and
- the results of examinations by physical therapists documenting strength and coordination problems in her right hand and arm (*Id.*, citing Tr. 573-661).

Plaintiff specifically alleges that an initial evaluation performed by a physical therapist on February 25, 2009, shows that she was able to use her hands only occasionally. (*Id.*, citing Tr. 608). On that date, the therapist assessed plaintiff's functional capability to lift both arms overhead as being significantly limited based on "subjective examination," and on objective

---

[12] The Court recognizes that the new evidence relating to plaintiff's MS diagnosis may explain her upper extremity weakness and lack of coordination. However, the Court may not consider this new evidence in conducting its substantial evidence review of the ALJ's decision which must be based on the record that was before the ALJ at the time he made his decision. See *Wyatt*, 974 F.2d at 685. Thus, the Court evaluates this assignment of error based on the evidence in the existing administrative record.

examination the therapist determined plaintiff's muscle strength in her right upper extremity to be -3/5 with pain in the C7 and C5 dermatomes of the right upper extremity and following the S2 dermatome.  (*Id.*).

The Commissioner argues that the ALJ reasonably evaluated plaintiff's impairments related to her upper extremities and determined that her impairments imposed some functional limitations on her ability to use her upper extremities.  (Doc. 19 at 8).   The Commissioner contends the ALJ reasonably relied on the January 2008 findings of consultative examining physician Dr. Bailey and the March 2008 EMG to find plaintiff retains "frequent" use of her right upper extremity, and the evidence plaintiff cites does not show she has greater functional limitations than the ALJ found.  (*Id.* at 9-10).

The ALJ determined as part of plaintiff's RFC that she was limited to lifting up to 10 pounds and she could frequently reach, handle and finger with the right arm.  (Tr. 16).   In determining plaintiff's RFC, the ALJ gave "some weight" to the assessments of the state agency reviewing physicians, who determined plaintiff could lift and carry 10 pounds frequently and 20 pounds occasionally but did not impose any other restrictions with respect to plaintiff's upper extremities.  (*Id.*, citing Tr. 251-59, 550).   The ALJ gave "little to no weight" to the assessment of Debra Johnson.[13]   (Tr. 16, citing Tr. 725).   That assessment found plaintiff could lift up to 10 pounds occasionally; she could not repetitively perform simple grasping due to right-sided problems; she could repetitively push and pull with her hands, but to an extent that depended on the nature of the job; and she could reach above shoulder level.  (Tr. 725).   The ALJ discounted Johnson's assessment on the ground that it appeared to parrot what plaintiff told

_____

[13]As noted earlier, the ALJ apparently mistakenly believed that Johnson was a medical doctor.  (*See* supra, p. 8, n. 4).

Johnson; it was inconsistent with plaintiff's own testimony, including her testimony that she can walk three blocks (Tr. 50) and with physical therapy records showing that she was walking in therapy (*Id.*, citing Tr. 263); the assessment was extremely terse; and the assessment gave no explanation for the conclusions it set forth. (Tr. 16). The ALJ decided to give "great weight" to the January 2008 assessment of consultative examining physician Dr. Bailey, which found plaintiff could perform a mild to moderate amount of work activity, because Dr. Bailey performed a full examination of plaintiff and testing. (*Id.*, citing Tr. 243-250).

Under the Social Security regulations, evidence from an "acceptable medical source" is required to establish the existence of a medically determinable impairment. 20 C.F.R. §§ 416.913(a), 404.1513(a); SSR 06-03p, 2006 WL 2329939, at *2. However, evidence from "other sources" as defined under the regulations may be used to show the severity of the claimant's impairment and how it affects the individual's ability to function. 20 C.F.R. § 416.913(d), 404.1513(d); SSR 06-03p. Nurse practitioners and therapists are "other sources" as defined under the regulations. *Id.* It may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if the source has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. *See* SSR 06-03p, 2006 WL 2329939, at *5. The ALJ has the discretion to determine the appropriate weight to accord the opinion of a medical source who is not an "acceptable medical source" based on all the evidence in the record. *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 530 (6th Cir. 1997).

Contrary to plaintiff's argument, the ALJ was not bound to accord any weight to the physical therapists' opinions or to find based on their records that plaintiff was limited to using her hands "at best, only occasionally." (Doc. 16 at 21). First, although plaintiff asserts that the

22

physical therapists who treated her documented the strength and coordination problems in her right

hand and arm, no physical therapist of record rendered an opinion concerning the functional

limitations imposed as a result of these problems. Second, the initial evaluation results reported

by the physical therapist who examined plaintiff on February 25, 2009, did not bind the ALJ to

conclude that plaintiff was able to use her hands only occasionally. (Doc. 16 at 21). The

physical therapist reported as part of the "subjective examination" that plaintiff had loss of function

of a moderate degree, she had moderate restriction of her activity as result of pain and numbness,

and she was significantly limited in her ability to raise both arms overhead. As part of the

objective examination, the therapist found that plaintiff's muscle strength was -3/5 on the right

side. (Tr. 608). However, the physical therapist did not give an opinion as to the functional

limitations, if any, plaintiff's right side issues imposed on her ability to lift weight and to use her

hands, and neither did the therapist offer an opinion as to plaintiff's prognosis.

Nor was the ALJ bound by Johnson's opinion that plaintiff could not perform repetitive

simple grasping or fine manipulation. (Tr. 725). The ALJ reasonably determined that Johnson's

report appeared to "parrot" plaintiff's self-reported limitations; the extreme limitation reported by

plaintiff that she was "unable to stand," which Johnson accepted, was contradicted by plaintiff's

testimony at the hearing that she can walk three blocks (Tr. 50) and by the physical therapy

records showing that she was walking in therapy (*Id.*, citing Tr. 263); the assessment was

bare-bones; and the assessment was devoid of any medical findings to support the functional

limitations it imposed. (Tr. 16).

Finally, plaintiff has not shown that the ALJ misinterpreted the MRI results and that these

results, together with the other evidence of record, demonstrate that she was more limited in the

use of her right upper extremity than the ALJ found. The ALJ set forth the results of the 2003,

23

2006 and 2009 MRIs and stated that the MRIs showed no evidence of nerve root compromise.

(Tr. 12, 15). Plaintiff alleges that the 2006 and 2009 MRIs show "significant disc herniations and degenerative hypertrophy causing stenosis of the spine at all levels, which, contrary to what the ALJ wrote, do cause impingement on nerves." (Doc. 16 at 21, citing Tr. 332-337, 471-475, 564-66). However, plaintiff has not pointed to evidence in the record that shows the ALJ erred in his assessment of the medical evidence and that her MRIs were interpreted by a medical source as showing "impingement on nerves." Moreover, in assessing plaintiff's degree of limitation, the ALJ was entitled to rely on the normal EMG results obtained in March 2008 (Tr. 388-89), which were obtained after plaintiff's 2006 MRIs. Accordingly, the ALJ did not err by giving the greatest weight to the opinions of the state agency reviewing physicians and the consultative examining physician, Dr. Bailey, in determining that plaintiff was limited to occasionally lifting ten pounds and frequently reaching, handling and fingering with her right arm. (Tr. 16). *See* 20 C.F.R. §§ 416.927(e)(2), 404.1527(e)(2) (ALJ must consider findings and other opinions of state agency medical consultants and other program physicians, except for the ultimate determination as to whether the claimant is disabled). Plaintiff's first assignment of error should be overruled.

### 3. The ALJ did not err by disregarding the opinions of plaintiff's treating podiatrist.

Plaintiff argues that the ALJ erred by failing to give controlling weight to the opinions of her treating podiatrist, Dr. Brarens. (Doc. 16 at 22-23). The ALJ stated that in November and December of 2008, Dr. Brarens noted that plaintiff had no limitations in her activities resulting from her foot and ankle condition. (Tr. 16, citing Tr. 673, 676). The ALJ noted that subsequently, in September 2009, Dr. Brarens wrote a note recommending that plaintiff live in a dwelling without stairs since stairs would aggravate the arthritis in her feet and ankles. (*Id.*,

24

citing Tr. 724). The ALJ stated that he would consider Dr. Brarens' opinions but "with caution" since Dr. Brarens provided no explanation for the conflict in his opinions. (Tr. 16). After considering all of the physicians' opinions, together with the remaining evidence of record, the ALJ limited plaintiff to a range of sedentary work with restrictions that included standing/walking a total of two hours, standing 15 to 20 minutes at a time, and walking three blocks at a time. The ALJ noted that the time periods for sitting, standing and walking were drawn from the testimony plaintiff gave at the hearing in response to specific questions as to what she thought her limitations were. (*Id.*).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. §§ 416.917(d)(2), 404.1527(d)(2); *see also Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004).

Here, plaintiff alleges, without any citation to the record, that Dr. Brarens provided several opinions regarding her functional capacity. (Doc. 16 at 22). However, plaintiff does not identify those functional limitations or attempt to explain what functional limitations, if any, beyond those found by the ALJ are supported by Dr. Brarens' medical opinions. Dr. Brarens' recommendation that plaintiff should live in a dwelling without stairs because stairs would aggravate her foot and ankle arthritis and tendonitis does not impose any functional limitations, it is not an opinion on the nature or severity of plaintiff's impairment, and it does not constitute evidence that plaintiff is unable to engage in substantial gainful activity. Accordingly, the ALJ did not err by deciding to

25

consider this recommendation, as well as any other opinion offered by Dr. Brarens, "with caution"

when fashioning the RFC and by not imposing additional functional limitations based on Dr.

Brarens' opinions.   Plaintiff's second assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT**:

This matter be **REMANDED** pursuant to Sentence Six of 42 U.S.C. § 405(g).

Date: _8/28/2012_

_Karen L. Litkovitz_
Karen L. Litkovitz
United States Magistrate Judge